IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Enrique Rodriguez, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>  v.<br><br>Ford Motor Company, a Delaware Corporation,<br><br>        Defendant. | Case No.: 1:21-cv-02553 |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Enrique Rodriguez ("Plaintiff"), individually and on behalf of all others similarly situated, upon personal knowledge of facts pertaining to him and on information and belief as to all other matters, by and through undersigned counsel, hereby brings this First Amended Class Action Complaint against Defendant Ford Motor Company ("Defendant" or "Ford").

## NATURE OF THE ACTION

1. Model year 2015–2017 Ford Mustang vehicles ("Subject Vehicles") have a dangerous and defective trunk lid wiring harness that causes numerous features, including critical safety equipment, to function intermittently or not at all. The defective wiring harness can and does interfere with the backup camera, trunk release, trunk light, and satellite radio reception, and poses a significant safety risk to drivers and occupants of Subject Vehicles and the public.

2. When owners and lessees of the Subject Vehicles have sought repair of this defect, they are often informed their vehicle requires a costly fix. The repair procedure Ford communicated to its service technicians is dangerous, inadequate, and does not repair the original

defective wiring harness. Ford's dealerships and other repair service providers routinely tell owners of the Subject Vehicles that no problem could be identified with their vehicle, which then continues to malfunction, subjecting owners and lessees to the expenses and safety risks attributable to the defective wiring harness.

3. Prior to selling the Subject Vehicles, Ford knew that the trunk lid wiring harnesses in the Subject Vehicles are defective, yet it omitted and kept this material fact from Plaintiff and other Class members.

4. In December 2018, Ford issued a technical service bulletin ("TSB") informing service technicians of the wiring harness defect and recommending a repair procedure (but not extending additional warranty coverage) for the defective wiring harness. Ford has not successfully remedied the defect, has not made owners of the Subject Vehicles whole, and has not made the Subject Vehicles safe.

5. The defective wiring harnesses included in the Subject Vehicles purchased or leased by Plaintiff and the other Class members did not perform as advertised, as promised, and as warranted. As a result of Ford's misconduct, Plaintiff and the other Class members were each injured on account of receiving Subject Vehicles that were fundamentally different from what they believed they were purchasing, and less valuable than was represented.

## JURISDICTION AND VENUE

6. The Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(d), because this matter was brought as a class action under Fed. R. Civ. P. 23, at least one proposed Class member is of diverse citizenship from Defendant, the proposed Class includes more than 100 members, and the aggregate amount in controversy exceeds five million dollars ($5,000,000), excluding interest and costs.

7. The Court has personal jurisdiction over Defendant and venue is proper pursuant to 28 U.S.C. § 1391, because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within this District. Plaintiff Enrique Rodriguez resides in this District and purchased his Subject Vehicle in this District. Ford has marketed, advertised, sold, and leased Subject Vehicles within this District.

## PARTIES

**Plaintiff Enrique Rodriguez**

8. Plaintiff Enrique Rodriguez resides in Roselle, Illinois. Plaintiff owns a 2015 Ford Mustang EcoBoost that he purchased in or about October 2019, from Hopkins Ford of Elgin, an authorized Ford dealership in Elgin, Illinois. Prior to purchasing his Vehicle, Plaintiff observed and became aware that his Vehicle was equipped with a backup camera, and understood that Ford included this feature in his Vehicle. He reasonably expected the backup camera in his Vehicle to work.

9. Neither Ford's website nor the dealership from which he purchased his Subject Vehicle disclosed to Plaintiff that his Subject Vehicle contained a defect whereby the trunk lid jeopardizes the vehicle's wiring and causes failures in key safety features, including the backup camera.

10. In or about November 2019, the defect manifested, causing Plaintiff's Subject Vehicle's backup camera to malfunction. The defect causes intermittent backup camera malfunction and failure in Plaintiff's Subject Vehicle.

11. Plaintiff continues to experience backup camera failure due to the defective wiring on his Subject Vehicle, causing safety concerns during operation of his vehicle.

3

12. Had Ford disclosed the defect on its website, through its dealership, in its warranty manual, or elsewhere prior to Plaintiff purchasing his Subject Vehicle, Plaintiff would not have made the purchase, or would have paid less for the Subject Vehicle. As a result, Plaintiff received less than what he paid for his Subject Vehicle and did not receive the benefit of his bargain.

**Defendant Ford Motor Company**

13. Defendant Ford Motor Company is a Delaware limited liability company with its principal place of business in Dearborn, Michigan. Defendant designed, manufactured, marketed, distributed, leased, and sold, through its authorized dealers, distributors, and other agents, the Subject Vehicles in the United States to Plaintiff and the other class members.

## FACTUAL BACKGROUND

*The Defective Trunk Lid Wiring Harness*

14. The Subject Vehicles are equipped with defective trunk lid wiring harnesses, highlighted in the image below.



15. The trunk lid wiring harness is composed of several separate wires responsible for transmitting power and data to the backup camera, luggage compartment lamp, luggage compartment lid release, and satellite radio antenna, which is all bundled together in a single wire

4

loom. Due to a defect in materials and workmanship, the metal conductors inside these wires are prone to fatiguing and breaking, resulting in an intermittent or permanent short circuit and the malfunction of the associated component. By nature, this defect becomes increasingly severe over time.

16. Owners of the Subject Vehicles experience the consequences of this defect and have reported it to NHTSA repeatedly:

- BACKUP CAMERA AND TRUNK BRAKE LIGHT DO NOT WORK DUE TO KNOWN FLAW IN TRUNK WIRING HARNESS DESIGN. WIRES INSIDE THE HARNESS BREAK FROM OPENING AND CLOSING TRUNK DUE TO COMPRESSION. DEALERSHIP HAS REPAIRED ONCE WHILE UNDER WARRANTY BY CHEAPLY REPLACING SECTIONS OF BROKEN WIRE AND CRUDELY WRAPPING THE ENTIRE HARNESS WITH BLACK ELECTRICAL TAPE, HOWEVER MORE WIRES HAVE BROKEN IN NEW LOCATIONS ALONG THE HARNESS. THIS IS A KNOWN DEFECT WITH A TECHNICAL BULLETIN PUBLISHED BY FORD. HOWEVER THE SERVICE DEPARTMENT REFUSED TO ACKNOWLEDGE THAT THIS IS AN ISSUE COMMON WITH 15-17 MUSTANGS. DESPITE CLEARLY EXPLAINING WHAT WAS WRONG, THEY CLAIMED I WOULD HAVE TO PAY $125 DIAGNOSTIC FEE BECAUSE THEY DON'T KNOW IF THE WIRING MIGHT HAVE BEEN CHEWED BY "VARMINTS." (NHTSA ID 11343732)

- BACK UP CAMERA REPEATEDLY WORKS INTERMITTENTLY CAUSING ME TO BACK UP INTO A POST, COSTING $1200 IN DAMAGES ELECTRICAL WIRES GOING TO TRUNK LID ARE INCREDIBLY THIN AND FLIMSY. THIS EFFECTS THE BACK UP CAMERA, TRUNK RELEASE, TRUNK LIGHT, ETC.; ALL OF WHICH HAVE FAILED AT ONE TIME OR ANOTHER. REPAIRED WIRING TWICE BUT THEY ARE SO FRAIL, THEY CONTINUE TO SNAP AND CAUSE MALFUNCTION THROUGHOUT THE CAR. (NHTSA ID 11327647).

- WIRING TO THE REAR DECK GETS PINCHED WHEN TRUNK OPENS/CLOSES. REAR CAMERA AND TRUNK RELEASE DO NOT WORK AND "TRUNK AJAR" DASH NOTIFICATION WILL NOT TURN OFF. THIS IS A KNOWN DESIGN DEFECT BY FORD. I HAVE CREATED 2 SEPARATE CASES WITH FORD CUSTOMER CARE AND THEY REFUSE TO TAKE RESPONSIBILITY FOR FULL REPAIRS. (NHTSA ID 11282221)

- THE REARVIEW CAMERA WILL INTERMITTENTLY DISPLAY A BLANK OR DISTORTED IMAGE. WHEN PLACING THE CAR IN REVERSE THE CAMERA WILL INTERMITTENTLY DISPLAY A BLANK SCREEN OR DISTORTED IMAGE WHILE REVERSING THE VEHICLE. THIS REDUCES THE DRIVER'S VIEW OF

WHAT IS BEHIND THE VEHICLE, INCREASING THE RISK OF A CRASH. THIS HAPPENS WHEN BOTH STATIONARY AND IN MOTION.

THIS IS THE SAME ISSUE THAT MY 2020 FORD MUSTANG GT VIN [XXX] HAS JUST RECEIVED A RECALL NOTICE FOR.

THE CAMERA BEGAN TO FAIL THE SUMMER OF 2020.

INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6). *TR (NHTSA ID 11375846)

- REAR BACK UP CAMERA WORKS INTERMITTENTLY WHEN SHIFTER PLACED IN REVERSE. SOMETIMES IT SHOWS DISTORTED IMAGES AND SOMETIMES IT JUST GOES BLANK WITH A MESSAGE ON THE SCREEN TO CONTACT YOUR FORD DEALER. (NHTSA ID 11362747)

- BACKUP CAMERA FUNCTIONS INTERMITTENTLY. OFTEN SHOWING AN ERROR MESSAGE, OF REAR VIEW CAMERA NOT AVAILABLE. (NHTSA ID 11362696)

- BACK UP CAMERA HAS SAME SYMPTOMS AS 2020 FORD MODELS BEING RECALLED.8/4/20

17. Backup cameras are a critical safety feature in automobiles. Backover crashes have killed hundreds of people each year and injure thousands more.[1] Recognizing the danger posed by backover crashes, in 2008 Congress passed the Cameron Gulbransen Kids Transportation Safety Act, requiring regulators to enact measures requiring the adoption of technology to improve rearview visibility, which was finally embodied in Federal Motor Vehicle Safety Standard number 111. Accordingly, functioning backup cameras are a requirement of baseline vehicle functionality and a minimum level of quality. The defective trunk lid wiring harness causes the backup camera on the Subject Vehicles to malfunction or fail and the defect poses a serious safety hazard.

18. NHTSA has received complaints alleging the wiring harness defect resulted in vehicle crashes. *See* NHTSA ID 11327647, 11375846, ¶ 16, *supra*.

---

[1] *See* USA TODAY, https://www.usatoday.com/story/money/cars/2018/05/02/backup-cameras/572079002/ (last visited April 22, 2022).

19. Compounding the seriousness of the defect, the repair procedure Ford recommended in TSB 18-2362 is not a safe or proper repair. The procedure advises technicians to splice new wire into the defective harness to replace the broken wire and introduces two new solder joints for each wire replaced. Solder joints are inflexible and even more prone to fatigue and breakage than the original defective wiring. The repair does not introduce any additional strain relief or countermeasure. As a result, vehicles repaired in accordance with TSB 18-2362 are highly likely to exhibit the wiring harness defect again, as described by the first two complaints listed in ¶ 16, *supra.*

20. In February 2022, Ford recalled the Subject Vehicles noting that the trunk lid wiring harness was defective. *See* NHTSA Campaign No. 22V082000. Like TSB 18-2362, the repair procedure in the recall calls for the same splice of new wire into the defective harness and introduction of the solder joints.

21. Ford lists the backup camera as a feature in its owner manual and in sales material for the Subject Vehicles.

22. By including the backup camera in the Subject Vehicles, Ford represented to Plaintiff and Class members that the Subject Vehicles contained a working backup camera. Plaintiff relied on this when purchasing his vehicle.

*Ford Knew the Trunk Lid Wiring Harnesses in the Subject Vehicles Are Defective*

23. At the same time Ford was selling the Subject Vehicles to Plaintiff and the car-buying public, Ford was well aware of the problems with Subject Vehicles' trunk lid wiring harnesses, both from the internal validation and testing that Ford performed and from its past experience and expertise designing automotive wiring.

24. The fact that metal wire has a finite fatigue life and wiring applications involving large deflection (such as the trunk lid wiring harness) require special attention to guarantee function over a large number of load cycles is readily obvious to qualified engineers, and is well known to Ford.

25. Federal regulations require automobile manufacturers to build vehicles that comply with the Federal Motor Vehicle Safety Standards (49 C.F.R. § 571). The existence of these standards necessarily requires Ford to extensively test its vehicles prior to selling them. During the course of these and other quality validation testing conducted by its engineers prior to their sale, Ford became aware of the defective wiring harness.

26. Ford utilizes mechanical test fixtures designed to replicate approximately ten years of average use of doors, liftgates, and trunk lids. Because Ford tested the trunk lid on Subject Vehicles for tens of thousands of load cycles before the Subject Vehicles were made available for sale, Ford necessarily discovered, and knew or should have known about, the wiring defect before the Subject Vehicles were sold.

27. Ford was also aware of the defect based upon negative consumer responses and reactions about the Subject Vehicles, yet it continued to sell and lease the Subject Vehicles with the defect.

28. Before Plaintiff purchased his vehicle, and before the filing of this lawsuit, Ford had already investigated and acknowledged the defect. In a recent recall document, Ford noted that its Critical Concern Review Group had investigated the trunk lid wiring harness damage in 2018.[2]

29. Ford was also aware of the defect through the filing of a similar class action lawsuit in the Central District of California, *Glassburg v. Ford Motor Company*, No. 2:21-cv-01333,

---

[2] *See* https://static.nhtsa.gov/odi/rcl/2022/RMISC-22V082-2545.pdf

8

which was filed on February 12, 2021 and also alleges that the Subject Vehicles contain a defective trunk lid wiring harness.

30. To date, Ford has failed to remedy the defect and continued to sell the Subject Vehicles despite its knowledge of the defect.

31. To date, Ford has not demonstrated that it is capable of providing an adequate repair for the Defect, and Plaintiff and class members do not know whether Defendant is capable of providing a repair for the Defect. As such, and without the benefit of discovery, it is for all practical purposes impossible to know at this time whether a remedy at law or in equity will provide the appropriate full relief for Plaintiff and members of the Class. As a result, Plaintiff, at this stage of the litigation, seeks both restitution and a remedy at law, where the claims so permit. Further, Plaintiff seeks an injunction enjoining Defendant and its agents, servants, and employees, and all persons acting under, in concert with, or for it from selling Subject Vehicles without notice that they are subject to the Defect, which cannot be repaired, and that this remains the situation.

## CLASS ALLEGATIONS

32. This action is brought as a class action pursuant to Fed. R. Civ. P. 23(a) (b)(2), and (b)(3) on behalf of a Class defined as follows:

> All persons and entities in the state of Illinois that purchased or leased a Subject Vehicle for end use and not for resale.

33. Excluded from the Class are: (i) Defendant and its officers and directors, agents, affiliates, subsidiaries, authorized distributors and dealers, (ii) all Class members who timely and validly request exclusion from the Class, and (iii) the Judge presiding over this action.

34. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

9

35. **Numerosity:** The members of the Class are so numerous that joinder of all Class members in a single proceeding would be impracticable. While the exact number and identities of individual members of the Class is unknown at this time, such information being in the sole possession of Ford and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that thousands of Class Vehicles have been sold and leased in Illinois.

36. **Existence/Predominance of Common Questions of Fact and Law:** Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

    a. whether Ford engaged in the conduct alleged herein;

    b. whether Ford omitted and misrepresented material facts to purchasers and lessees of Subject Vehicles;

    c. whether Ford's omissions and misrepresentations regarding the Subject Vehicles were likely to mislead a reasonable consumer;

    d. whether Ford breached warranties with Plaintiff and the other Class members when it produced, distributed, and sold the Subject Vehicles;

    e. whether Plaintiff's and other Class members' Subject Vehicles were worth less than as represented as a result of the conduct alleged herein;

    f. whether Plaintiff and the other Class members have been damaged and, if so, the extent of such damages; and

    g. whether Plaintiff and the other Class members are entitled to equitable relief, including but not limited to, restitution and injunctive relief.

37. Ford engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of the other Class members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

10

38. **Typicality:** Plaintiff's claims are typical of the claims of the other Class members because, among other things, Plaintiff and the other Class members were injured through the substantially uniform misconduct described above. As with Plaintiff, Class members also purchased or leased a Subject Vehicle containing the defect. Plaintiff is advancing the same claims and legal theories on behalf of himself and all other Class members, and no defense is available to Ford that is unique to Plaintiff. The same events giving rise to Plaintiff's claims for relief are identical to those giving rise to the claims of all Class members. Plaintiff and all Class members sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Ford's wrongful conduct in selling/leasing and failing to remedy the Subject Vehicles.

39. **Adequacy:** Plaintiff is an adequate Class representative because he will fairly represent the interests of the Class. Plaintiff has retained counsel with substantial experience in prosecuting consumer class actions, including consumer fraud and automobile defect class action cases. Plaintiff and his counsel are committed to prosecuting this action vigorously on behalf of the Class they seek to represent and have the resources to do so. Neither Plaintiff nor his counsel has any interest adverse or antagonistic to those of the Class.

40. **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other detriment suffered by Plaintiff and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford, so it would be impracticable for Class members to individually seek redress for Ford's wrongful conduct. Even if Class members could afford individual litigation, the court system should not be required to undertake such an unnecessary burden. Individualized litigation would also create a potential for inconsistent or

11

contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents no significant management difficulties, if any, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

41. Upon information and belief, members of the Class can be readily identified and notified based upon, *inter alia*, the records (including databases, e-mails, dealership records and files, etc.) Ford maintains regarding its sales and leases of Subject Vehicles.

## CAUSES OF ACTION

### COUNT I
### Breach of Implied Warranty of Merchantability
### (On Behalf of Plaintiff and the Class)

42. Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

43. Defendant is and was at all relevant times a merchant with respect to, and manufactured, distributed, warranted, and sold, the Subject Vehicles.

44. A warranty that the Subject Vehicles were in merchantable condition and fit for the ordinary purposes for which they were sold is implied by law.

45. Plaintiff and the other Class members purchased the Subject Vehicles manufactured and sold by Defendant in consumer transactions.

46. The Subject Vehicles, when sold and at all times thereafter, were not in merchantable condition and the wiring was not in merchantable condition and were not fit for the ordinary purpose for which cars are used. The Subject Vehicles left Defendant's possession and control with defective wiring that rendered them at all times thereafter unmerchantable, unfit for ordinary use, unsafe, and a threat to public safety. Plaintiff and the other Class members used their

Subject Vehicles in the normal and ordinary manner for which Subject Vehicles were designed and advertised.

47. Defendant knew before the time of sale to Plaintiff and the other Class members, or earlier, that the Subject Vehicles were produced with defective wiring that was unfit for ordinary use, that rendered the Subject Vehicles unfit for their ordinary purposes, and that posed a serious safety threat to drivers, passengers, and the public. This knowledge was based on Defendant's own industry standard internal validation of its vehicles prior to launching a new model, internal testing, knowledge about and familiarity with the wiring included in the Subject Vehicles, history of similar problems with similar wiring in prior models, and complaints by consumers and third parties.

48. The existence and ubiquity of the defect is illustrated by the numerous publicized consumer complaints, disputes, and failed remedial measures nationwide.

49. Despite Plaintiff's and the other Class members' normal, ordinary, and intended uses, maintenance, and upkeep, the wiring of the Subject Vehicles experienced and continue to experience the defect and premature failure.

50. Plaintiff's and other Class members' wiring and the Subject Vehicles are, and at all times were, not of fair or average quality, nor would they pass without objection.

51. All conditions precedent have occurred or been performed.

52. Defendant had actual knowledge of the trunk lid wiring harness defect as evidenced by its testing of the products, the many consumer reviews complaining of the defect, a lawsuit regarding the same defect in California, and the investigation done by Ford regarding the defect. All of these facts would have alerted Ford to the fact that Plaintiff's vehicle was defective and that it breached its implied warranties.

53. Defendant's warranty disclaimers, exclusions, and limitations, to the extent that they may be argued to apply, were, at the time of sale, and continue to be, unconscionable and unenforceable to disclaim liability for a known, latent defect. Defendant knew when it first made these warranties and their limitations that the defect existed, and the warranties might expire before a reasonable consumer would notice or observe the defect. Defendant also failed to take necessary actions to adequately disclose or cure the defect after the existence of the defect came to the public's attention and sat on its reasonable opportunity to cure or remedy the defect, its breaches of warranty, and consumers' losses. Under these circumstances, it would be futile to enforce any informal resolution procedures or give Defendant any more time to cure the defect or cure its breaches of warranty.

54. Plaintiff and the other Class members suffered and will suffer diminution in the value of their Subject Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their defective Subject Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

55. Privity is not required in this case because Plaintiff and the other Class members are intended third-party beneficiaries of contracts between Defendant and its dealers; specifically, they are the intended beneficiaries of Defendant's implied warranties. The dealers were not intended to be the ultimate consumers of the Subject Vehicles; the warranty agreements were designed for, and intended to benefit, only the ultimate consumers—such as Plaintiff and the other Class members. Indeed, under the terms of the New Vehicle Limited Warranty, the warranty applies if the vehicle "was originally sold or leased by Ford Motor Company or one of its dealers

in the United States or U.S. Federalized Territories, and it was originally registered/licensed and operated in the United States, U.S. Federalized Territories, or Canada."

56. Privity is also not required or satisfied because Plaintiff's and the other Class members' Subject Vehicles are inherently dangerous due to the aforementioned defects and nonconformities. Congress recognized the inherent danger of vehicles without cameras when it passed the Cameron Gulbransen Kids Transportation Safety Act. Without a functioning backup camera, the Subject Vehicles pose a danger not only to the drivers and passengers of the Subject Vehicles, but also to anyone who is around the Subject Vehicles, especially young children and disabled persons who may not be visible behind the vehicle.

## COUNT II
## Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act
## 815 Ill. Comp. Stat. 505/1, *et seq.* ("ICFA")
## (On Behalf of Plaintiff and the Class)

57. Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

58. The ICFA prohibits unfair and deceptive acts or practices in the conduct of trade or commerce. 815 Ill. Comp. Stat. 505/2.

59. Plaintiff pleads his claim under the ICFA both based upon Ford's affirmative misrepresentations and, separately, Ford's omissions concerning the defect.

60. Plaintiff and other Class members are consumers who purchased or leased a Subject Vehicle for end use and not for resale.

61. Defendant's conduct, as described above, in omitting the facts that the Subject Vehicles contain the wiring defect constitutes an unfair practice and was likely to mislead a reasonable consumer. Particularly, inclusion of a backup camera in a vehicle represents to a

consumer that the vehicle has a functioning backup camera. The omission of any statements to Plaintiff and Class members that the backup camera would fail to function properly deceived Plaintiff and Class members.

62. Defendant knew or should have known, when it sold or leased Subject Vehicles to Plaintiff and the other Class members, the material fact that the Subject Vehicles are equipped with the wiring defect discussed herein, which creates a safety hazard for Plaintiff, class members, and other vehicle operators on the road. Through internal pre-sale testing procedures customarily conducted by Ford, Ford learned of the defect in the Subject Vehicles. Defendant's knowledge is further evidenced by Ford's issuance of the TSB, and the NHTSA complaints discussed *supra*, which Ford reviews as part of its business practices. Ford also learned about the defect from the deluge of consumer complaints that came pouring in after the Subject Vehicles were introduced to the market, and from the presentation of Subject Vehicles by Class members to Ford's authorized dealerships for repair of the Defect.

63. Reasonable consumers would consider the Defect, and functioning and properly working wiring harnesses, backup cameras, and other components impacted by the wiring Defect, to be material in deciding whether to purchase a Subject Vehicle.

64. Ford's practices offend public policy, are immoral, unethical, oppressive, and unscrupulous, predatory against the established moralities of society, caused and cause substantial injury to consumers, and pose a risk to public safety.

65. Ford's unfair and deceptive acts or practices were the foreseeable and actual cause of Plaintiff and the other Class members on account of receiving a car that lacked the performance, safety, and quality that Ford represented the vehicles to have, or about which Ford omitted material information regarding the wiring defect.

66. Plaintiff and the other Class members paid for a car that was supposed to meet certain specifications. When they received a vehicle that did not conform to these specifications and which fell below minimum standards of quality, safety, and performance, Plaintiff and the other Class members were damaged on account of receiving a car worth less than as represented. Plaintiff and the other Class members suffered diminution in value of Subject Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing defective Subject Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court enter judgment in his favor and against Defendant as follows:

A. Certifying the Class under Fed. R. Civ. P. 23 as requested herein;

B. Appointing Plaintiff as class representative and undersigned counsel as class counsel;

C. Finding that Ford engaged in the unlawful conduct as alleged herein;

D. Awarding Plaintiff and the other Class members actual, compensatory, and consequential damages;

E. Awarding Plaintiff and the other Class members statutory damages;

F. Awarding Plaintiff and the other Class members declaratory and injunctive relief;

G. Awarding Plaintiff and the other Class members restitution and disgorgement;

H. Awarding Plaintiff and the other Class members exemplary damages, should the finder of fact determine that Ford acted with malice or oppression;

I. Awarding Plaintiff and the other Class members pre-judgment and post-judgment interest on all amounts awarded;

J. Awarding Plaintiff and the other Class members reasonable attorneys' fees, costs, and expenses; and

K. Granting such other relief as the Court deems just and appropriate.

## JURY TRIAL DEMAND

Plaintiff, individually and on behalf of all others similarly situated, hereby requests a jury trial, pursuant to Federal Rule of Civil Procedure 38, on all claims so triable.

Dated: April 25, 2022

Respectfully submitted,

*/s/ Ben Barnow*
BEN BARNOW
*b.barnow@barnowlaw.com*
ANTHONY L. PARKHILL
*aparkhill@barnowlaw.com*
**BARNOW AND ASSOCIATES, P.C.**
205 W. Randolph Street, Suite 1630
Chicago, Illinois 60606
312.621.2000 (*telephone*)
312.641.5504 (*facsimile*)

ANDREW W. FERICH*
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, Pennsylvania 19087
310.474.9111 (*telephone*)
310.474.8585 (*facsimile*)

ROBERT R. AHDOOT*
*rahdoot@ahdootwolfson.com*
CHRISTOPHER STINER*
*cstiner@ahdootwolfson.com*
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, California 91505
310.474.9111 (*telephone*)
310.474.8585 (*facsimile*)

*\*pro hac vice*

*Attorneys for Plaintiff and the Putative Class*